2026 IL App (1st) 252083-U

SECOND DIVISION
February 17, 2026

No. 1-25-2083

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF ASHER WEISS, | ) | Appeal from |
| | ) | the Circuit Court |
| Petitioner-Appellee, | ) | of Cook County |
| | ) | |
| and | ) | 24D404 |
| | ) | |
| RAIZEL WEISS, | ) | Honorable |
| | ) | Renee Goldfarb, |
| Respondent-Appellant. | ) | Judge Presiding |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**O R D E R**

¶ 1     *Held*: Denial of motion to compel arbitration affirmed where movant waived her contractual right to arbitrate.

¶ 2     Petitioner Asher Weiss and respondent Raizel Weiss are nearing the end of a contentious dissolution of their marriage. They initially agreed to mediate and, if necessary, arbitrate, but, rather quickly, they were in arbitration and ultimately entered prolonged litigation. They went to trial on their parenting and financial issues and had to schedule one additional afternoon to wrap up the financial matters. A week before the court date, Raizel moved to compel arbitration. The circuit court denied the motion, finding that Raizel had waived her right to arbitrate. This is Raizel's interlocutory appeal, in which she contends that she filed the motion at the first

opportunity and before any financial matters had been submitted. See Ill. S. Ct. R. 307(a)(1) (eff. Nov. 1, 2017). Asher responds that Raizel has been actively submitting arbitrable issues to the court, the parties are prepared to resolve their financial issues in short order, and Raizel's attempt to return to arbitration is causing delay and unnecessary expense.

¶ 3 The record presented for our review is lacking. The order on appeal contains two findings, the first of which is that "Raizel waived her right to arbitration for the reasons set forth on the record (via Zoom Recording), which are incorporated as if fully set forth in this Order." Then the court incorporated into its findings the portion of Asher's response memo that discussed Raizel's waiver, "as if [the memo were] fully read into the record".

¶ 4 The record before us, however, does not include a transcript, bystander's report, or agreed statement of facts concerning the hearing that took place over Zoom. See Ill. S. Ct. R. 323(a), (c), (d) (eff. May 19, 2021) (requiring the appellant to prepare and file a hearing transcript or an alternative); *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 156 (2005). A transcript or one of its approved alternatives would have disclosed what evidence, if any, was presented, what arguments were made, and what "reasons [the circuit court verbally] set forth on the record" for denying Raizel's motion. Furthermore, Raizel's appellate brief discloses very little about the two years of dissolution proceedings and, thus, indirectly supports Asher's contention that she has actively litigated and prolonged the dispute at every opportunity.

¶ 5 As the appellant, Raizel had the burden of presenting a sufficiently complete record of the proceedings in the circuit court to support a claim of error, and any doubts arising from the incompleteness of the record are to be resolved against her. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (where appellant did not provide a transcript or bystander's report of the hearing on

1-25-2083

a motion to vacate, the reviewing court had no basis for holding that the trial court had committed an error in denying the motion). A reviewing court is not required to search the record for the purpose of reversing. *In re Marriage of Hofstetter*, 102 Ill. App. 3d 392, 396 (1981). In fact, "[w]hen portions of the record are lacking, it will be presumed that the trial court acted properly in entry of the challenged order and that the order is supported by the part of the record not before the reviewing court." *Coleman v. Windy City Balloon Port, Ltd.*, 160 Ill. App. 3d 408, 419 (1987).

¶ 6 We could easily enter an affirmance on this basis (see *Corral*, 217 Ill. 2d at 157), but we do not do so, in part because we have benefit of the response memo that the circuit court incorporated into its order and in part because Asher's appellate response brief factually sets out Raizel's actions/inactions in mediation, arbitration and litigation and Raizel does not disagree with his statements. She only disagrees with the circuit court's ruling. Asher's writings seem to complete the picture and enable us to evaluate Raizel's appeal. Accordingly, we will proceed, but any doubts arising from the incompleteness of the record will be resolved against Raizel. See *Foutch*, 99 Ill. 2d at 391-92.

¶ 7 Asher and Raizel married in Israel in 2007 and had five children together by 2021. They moved to Chicago in 2012 and became part of an Orthodox Jewish community who lives in Chicago's Rogers Park neighborhood. Asher is a rabbi in full-time study at Chicago Community Kollel, where he is given an $8000 annual stipend and discretionary bonuses. Raizel is a stay-at-home mother. Asher and Raizel's financial resources are minimal. The family of seven receives SNAP and Medicaid benefits from the federal government. Asher and Raizel have small checking and savings accounts. They own a 2009 Toyota Sienna minivan that was valued at $1500 in 2024. They also own a 39% interest in a Chicago condominium in Rogers Park, for which they paid

$40,000 in February 2018. The record does not disclose why they neither occupy nor collect rent from the condo. Raizel and the youngest child reside in her parents' home. The record suggests that Raizel's siblings also live with their parents or at least nearby. Asher resides with the three middle children in an apartment that was the marital home. The oldest child is attending high school in New Jersey.

¶ 8     Asher petitioned for dissolution in January 2024, and in February 2024, he and Raizel signed an "AGREEMENT TO MEDIATION/ARBITRATION" with the Chicago Rabbinical Council (CRC), which is a Jewish rabbinical court.

¶ 9     The CRC agreement provided that Asher and Raizel would attempt to settle all of their "divorce issues" in mediation with a certain rabbi, but the rabbi could terminate the mediation at any time and submit the issues to binding arbitration. According to Asher, they reached a temporary parenting agreement and he agreed to pay $500 per month as child support, but Raizel violated the agreement and flaunted the authority of the CRC. One example is that after taking the children to see her family in Houston for part of the Passover vacation, Raizel did not return the children to Chicago on schedule—despite the involvement of the CRC. Asher contends that she did not book return flights until he threatened to pursue emergency proceedings in civil court and that her delay caused the children to miss a week of school.

¶ 10    As of May 6, 2024, the parties were in arbitration. The record indicates that the CRC determined the parties needed to work with a parenting coordinator/social worker, use a parenting communication app, and give the CRC a picture of their financial circumstances by completing the financial affidavits that are used in civil court. After the Houston trip, Raizel honored the parenting agreement only with respect to one of the children and kept the others with her. The

situation was not resolved for three weeks and ended only because her brothers intervened and escorted Raizel and the children to Asher's apartment. Along the way, she told a neighbor that her brothers were trying to kidnap the children. Inside Asher's apartment, she caused a distressing scene in front of the children which her brothers ended by carrying her out of the building and restraining her from returning. The next day, after her agreed-upon after-school time with the children, Raizel again relinquished only one child to Asher. She left her parents' home with the other children, claiming that she did so with the CRC's permission, and she would not disclose their location. Her claim about the CRC's approval was false and her parenting time was supposed to have been at her parents' home and under the supervision of one of her family members. There was also an ongoing disagreement about whether she was using the parenting communication app or had merely installed it and whether she was impeding an expert's parenting evaluation pursuant to 604.10(b) of the Illinois Marriage and Dissolution of Marriage Act. 750 ILCS 5/604.10(b) (West 2024).

¶ 11    Consequently, Asher returned to civil court on May 31, 2024 to file an emergency petition for an order of protection against Raizel on behalf of himself and the children. On June 3, 2024, after a pre-trial conference with the parties' attorneys, the court entered orders that appointed a guardian *ad litem* (GAL), specified a parenting schedule, mandated that Raizel's parenting time be supervised by her family, required the use of a certain parenting communication app, and enjoined certain harmful communication with the children.

¶ 12    On August 5, 2024, Asher filed an emergency petition to require Raizel to return the oldest child from Israel and suspend Raizel's parenting time. The petition indicated that Asher had neither agreed to nor been informed in advance of the travel plans, the GAL also learned about the trip at

the last minute and had recommended that the child not go to Israel, and the region was embroiled in military conflict. Also, Raizel would not disclose the child's whereabouts. That same day, Raizel's first set of attorneys filed a motion to withdraw, citing a "breakdown in communication." Following an emergency hearing on August 6, 2024, an agreed order was entered requiring Raizel to disclose the child's location and immediately return the child to the United States. The court scheduled an additional hearing the following week, which is when Raizel's first set of attorneys was allowed to withdraw.

¶ 13    Over the course of the next year, the marriage dissolution continued in this disordered fashion and the court greatly reduced Raizel's role in the children's lives. For instance, in September 2024, Raizel opposed vaccinations that were required by the children's school, and, with the GAL's support, Asher's emergency petition for temporary sole medical authority was granted, the children were vaccinated and resumed their schooling. Shortly after, during November 2024, Raizel's second set of attorneys withdrew, citing "irreconcilable differences." Another example is Asher's emergency motion in June 2025 to immediately suspend Raizel's parenting time. Asher listed her disturbing behavior after the section 604.10(b) expert (*id*.) and GAL had recommended that (1) Raizel's supervised parenting time consist of every other weekend and just a few hours during the week and (2) Asher have sole decision-making authority over all aspects of the children's lives. The same day that Asher's motion was granted, Raizel's third set of attorneys withdrew, citing "professional differences."

¶ 14    Meanwhile, financial matters were also being addressed without Raizel asserting that they were arbitrable. Asher sought reimbursement for a $5000 loan that he borrowed to pay for their child's return plane tickets from Israel. His request was scheduled and rescheduled over a period

of six months and seven court appearances. At no point did Raizel contend that the issue should instead be arbitrated. More specifically, on August 14 and September 4, 2024, the court entered continuances on Asher's request; on September 17, 2024, the court set the matter for hearing on October 31, 2024, but then continued the hearing to November 25, 2024, and then continued the hearing to January 16, 2025, when a financial order was entered. Raizel was ordered to reimburse Asher $2500 within seven days, which she did. The January order also indicated that the court would set trial dates when the parties returned for status on February 10, 2025.

¶ 15   In anticipation of the trial, in early November 2024, Raizel's second set of attorneys tendered her financial affidavit and supporting documents. They also chose to propound interrogatories on Asher pursuant to Supreme Court Rule 213(a), (Ill. S. Ct. R. 213(a) (eff. Jan. 1, 2018)); and request that Asher produce documents pursuant to Supreme Court Rule 214(a). Ill. S. Ct. R. 214(a) (eff. July 1, 2018).

¶ 16   Raizel's Rule 213(a) interrogatories (Ill. S. Ct. R. 213(a) (eff. Jan. 1, 2018)) requested significant financial information from Asher, including: Asher's employment income and benefits (Interrogatory 2); Asher's source(s) of income other than from his employment (Interrogatory 3); Asher's ownership interest in real estate, including the date acquired, amount paid, current fair market value, and associated debt (Interrogatory 4); Asher's interest in any business entities, including the percentage and value of his interest (Interrogatory 5); Asher's bank accounts, including their high and low balances (Interrogatory 6); whether Asher has a safety deposit box and what it contains (Interrogatory 7); whether any person or entity holds cash or property on his behalf (Interrogatory 8); Asher's ownership of any stocks, bonds, securities or other investments, including their cost and value (Interrogatory 9); Asher's ownership of life insurance, including its

value (Interrogatory 10); Asher's interest in any retirement-type plan, and the amount of funds currently held on his behalf (Interrogatory 11); Asher's outstanding indebtedness, including the present unpaid balance and dates and amounts of installment payments (Interrogatory 12); whether Asher is owed any money or property, and the amount of the obligation, unpaid balance, and installment payments (Interrogatory 13); information about Asher's vehicle, including the fair market value, indebtedness, and consideration paid for it (Interrogatory 14); whether Asher purchased or contributed toward the payment for or provided other consideration or improvement to an asset owned by a third party, and information pertaining to the same (Interrogatory 15); whether Asher made any gifts of cash or property to a third party, including the value of the gift (Interrogatory 16); whether Asher had loaned money to a third party, including the value of the loan (Interrogatory 17); whether Asher has sold or otherwise disposed of property owned by him and/or Raizel, including the approximate fair market value of the property (Interrogatory 18); whether any appraisals have been made for any property listed in his answers to these interrogatories (Interrogatory 19); whether anyone has prepared any statements of financial net worth or lists of his assets and liabilities, and information pertaining to the same (Interrogatory 20); the name of Asher's accountant, tax preparer, bookkeeper or anyone else who has prepared or kept financial documents and information regarding his assets and liabilities during the marriage (Interrogatory 21); a list of Asher's non-marital property (Interrogatory 22); a list of marital property, including its location and present value (Interrogatory 23); a list of Raizel's contribution and dissipation (Interrogatory 24); and whether Asher is incapacitated or limited in his ability to earn income, and information pertaining to the same (Interrogatory 26).

¶ 17    Raizel requested significant financial documentation from Asher pursuant to Rule 214(a),

1-25-2083

(Ill. S. Ct. R. 214(a) (eff. July 1, 2018)), including documents dating to 2021 regarding Asher's principal business or income-producing activity (Request 1); Asher's salary or regular monthly compensation (Request 2); Asher's unemployment benefits (Request 3); Asher's worker's compensation claims (Request 4); Asher's employment contracts (Request 5); Asher's employment perquisites (Request 6); Asher's business expenses (Request 7); Asher's personal federal and state tax returns (Request 8); Asher's partnership and corporate tax returns (Request 9); Asher's estate and gift tax returns (Request 10); the children's tax returns (Request 11); Asher's amended tax returns (Request 12); Asher's business checking accounts (Request 13); Asher's personal checking accounts (Request 14); Asher's savings accounts (Request 15); Asher's cryptocurrency (Request 16); Asher's accounts used for fund transfers (Request 17); the children's checking and savings accounts (Request 18); Asher's certificates of deposit (Request 19); Asher's brokerage accounts (Request 20); Asher's retirement plans and deferred compensation agreements (Request 21); Asher's safe deposit box(es) (Request 22); Asher's commercial paper (Request 23); Asher's personal financial statements (Request 24); Asher's loan applications (Request 25); Asher's debts and/or obligations (Request 26); Asher's charge cards and/or obligations (Request 27); Asher's real estate (Request 28); Asher's lease agreements (Request 29); Asher's vehicles (Request 30); Asher's vehicle insurance (Request 31); Asher's life insurance (Request 32); Asher's disability insurance (Request 33); Asher's health and dental insurance (Request 34); Asher's property, casualty and homeowners insurance (Request 35); Asher's wills, trusts and codicils (Request 36); Asher's gifts, trusts and inheritance (Request 37); Asher's jewelry, art, antiques and personal property of value (Request 38); Asher's appraisals (Request 39); Asher's airline miles (Request 40); Asher's assets in possession of another person (Request 41); Asher's club

- 9 -

memberships (Request 42); Asher's non-marital property (Request 44); Asher's legal fees (Request 58); any children's education fees paid by Asher (Request 59); any monthly living expenses paid by Asher (Request 60); and Asher's Social Security earnings statement (Request 61).

¶ 18    On March 20, 2025, the circuit court entered an order drafted by Raizel's third attorney which set trial dates and deadlines for discovery. The order does not state or imply that the trial would be limited to parenting-related issues or would exclude financial matters. The order specified in relevant part that all written discovery responses were to be tendered by May 9, 2025, the parties were to exchange updated financial affidavits no later than July 11, 2025 and the trial would occur on July 14, 15, 16, and 17, 2025.

¶ 19    Pursuant to the trial order, on May 9, 2025, Asher complied with Raizel's written discovery requests with the exception of some items that he said required his further investigation. He subsequently supplemented his discovery responses. At the outset of this order, we outlined the parties' financial circumstances. To that summary we add that Asher's financial disclosures in anticipation of the trial indicated that he had borrowed almost $70,000 to pay his attorney, the children's GAL, and the psychologist who completed the parenting evaluation pursuant to section 604.10(b). 750 ILCS 5/604.10(b) (West 2024). We were unable to find Raizel's financial disclosures in the supporting record and it appears that her attorney removed them before filing the record because he deemed his client's financial information to be "not relevant to this appeal." Asher indicates that Raizel has significant debts.

¶ 20    When Raizel's third set of attorneys withdrew 21 days before the trial, the court ordered her to either retain new counsel or file a *pro se* appearance within those 21 days. Raizel did neither.

When the trial started on July 14, 2025, she asked for a continuance, which the court granted, for one additional day. Raizel proceeded *pro se* during the trial on July 15, 16 and 17, 2025. The parties were able to finish the parenting aspect during those three days and the matter was continued to July 21, 2025 to set a further trial date on the financial matters. At the status call on July 21, 2025, the court scheduled two dates. The court scheduled August 13, 2025 at 2:00 to enter its allocation judgment (parenting plan) and required Asher and Raizel to appear in person. The court also scheduled September 17, 2025, from 1:00 p.m. to 5:00 p.m., for "continued trial on financial issues."

¶ 21    On August 13, 2025, the court entered an order drafted by the GAL which indicated that Raizel's parenting time would consist of Wednesday and Thursday evenings for approximately two hours each, and a half day on Sunday mornings. Raizel's parenting time had to be supervised and the parties were to split the cost of professional supervision.

¶ 22    On August 27, 2205, the court entered a more detailed order drafted by the GAL which allocated parental responsibilities and established a parenting plan. Asher was allocated sole decision-making authority for the minor children with respect to education, health, religion, and extracurricular activities. In regard to parenting time, the order again provided Raizel with limited parenting time for approximately eight hours per week under professional supervision. The order, however, included a "step up" parenting plan under which Raizel would have much more significant time with the children, if and when, the court removed the supervision.

¶ 23    Asher contends that since the conclusion of the three trial dates in July 2025, Raizel has repeatedly attempted to coerce him to participate in binding arbitration through a Jewish rabbinical court in Monsey, New York that we will refer to as the NYRC. Raizel and Asher have never agreed

to arbitrate with the NYRC and the organization had no part in the parties' arbitration and mediation with the CRC. Nevertheless, one of Raizel's brothers, Shlomo Francis, initiated arbitration proceedings at the NYRC on Raizel's behalf on August 26, 2025, *i.e.,* after the parties received the circuit court's parenting schedule.

¶ 24 The NYRC issued a series of summons, the first of which required Asher to appear before the NYRC "or Bais Din agreed by both parties" for arbitration on Tuesday, September 2, 2025 at 1:00 p.m. It stated that the following would be addressed:

"A. All custody details and issues shall be reviewed and confirmed by Bais Din according to halacha [Jewish Law].

B. All monetary issues shall be decided exclusively by Bais Din.

C. All above shall be recorded as an agreed judgement [(*sic*)] in the Cook County Courts."

¶ 25 The second summons was nearly identical but indicated that the arbitration would start on Tuesday, September 9, 2025 at 1:00 p.m.

¶ 26 The third summons was entitled "Third summons to Bais Din and Siruv Warning" and indicated the arbitration would begin on Wednesday, September 17, 2025 at 1:00 p.m., which was the pre-existing date and time for the trial to conclude in Chicago. Notably, the summons also informed Asher that if he did not respond, there would be a "siruv" (a finding of contempt of the Jewish court). He contends this also means there could be a "herem" against him and that a "herem" is the total exclusion of a person from the Jewish community and involves the disbursement of letters to warn community members that Asher should not be allowed to go to shul (temple) and that community members should not be within his proximity.

¶ 27 This summary brings us to the motion at issue. On the same day that the third summons

was issued, September 10, 2025, Raizel filed an emergency motion to compel arbitration, in which she asked the court to require Asher to submit to binding arbitration with the CRC pursuant to his agreement. Raizel was represented by her fourth attorney in these proceedings. She contended that when Asher filed for dissolution, he professed that the CRC would facilitate an agreed allocation judgment and parenting plan between the parties. Subsequently, however, he apparently "believed that the [CRC] was not ruling in a manner consistent with his wishes (or, perhaps, lacked the ability to enforce its own custody rulings)" and he returned to the circuit court in order to "divest [Raizel] of many parental rights." She also contended that the circuit court had to resolve the parenting issues before the remaining issues about finances could become subject to arbitration. The circuit court found that the motion was not an emergency and scheduled it for hearing on September 17, 2025 (the continued trial date on financial matters). According to Asher, Raizel's brother, Shlomo Francis, who initiated the NYRC proceedings on her behalf, was in the courtroom on September 17, 2025 "in a clear attempt to further intimidate and harass Asher into submitting to arbitration." After the parties submitted legal briefs, the circuit court denied the motion and Raizel's appeal followed.

¶ 28    We review the denial of Raizel's motion to compel arbitration for an abuse of discretion. *Schroeder Murchie Laya Associates, Ltd. v. 1000 W. Lofts, LLC*, 319 Ill. App. 3d 1089, 1094 (2001); *Northeast Illinois Regional Commuter R.R. Corp. v. Chicago Union Station Co.*, 358 Ill. App. 3d 985, 995 (2005). This standard is highly deferential to the circuit court. *In re Marriage of Sanfratello*, 393 Ill. App. 3d 641, 646 (2009). The circuit court is said to have abused its discretion when no reasonable person would agree with the court's position. *Id.*

¶ 29    A motion to compel arbitration should be granted when there is a valid arbitration

agreement and the litigation falls within the scope of the agreement. *Westlake Services, LLC v. Williams*, 2025 IL App (1st) 241383, ¶ 14. Arbitration agreements in domestic relations matters are enforceable. See *In re Marriage of Golden and Friedman*, 2012 IL App (2d) 120513.

¶ 30    However, a party can waive his or her right to arbitration. *Id.* ¶ 16; *Bishop v. We Care Hair Development Corp.*, 316 Ill. App. 3d 1182, 1191 ("a contractual right to arbitrate can be waived as with any other contract right"). A finding of waiver is disfavored because Illinois encourages alternative dispute resolution as a matter of public policy. *Id.* ¶ 18; *Lundy v. Farmers Group, Inc.*, 322 Ill. App. 3d 214, 219 (2001) (Illinois' public policy is to conserve judicial resources through alternative dispute resolution); *Atlas v. 7101 Partnership*, 109 Ill. App. 3d 236, 240 (1982) ("Since arbitration is an efficient, relatively inexpensive method of settling disputes, a waiver of a right to arbitrate is not to be lightly inferred.").

¶ 31    Waiver may be found when a party has acted inconsistently with claiming that right and thereby shown an intention to abandon the right. *Kostakos v. KSN Joint Ventures No. 1*, 142 Ill. App. 3d 533, 536-37 (1986); *Westlake Services*, 2025 IL App (1st) 241383, ¶¶ 14-16. When determining whether waiver has occurred, Illinois courts have considered (1) the moving party's actions; (2) whether that party has delayed in asserting the right and whether the delay prejudiced the nonmoving party; and (3) whether the parties included a no-waiver provision in their agreement. *Kostakos*, 142 Ill. App. 3d at 536-38; *Westlake Services*, 2025 IL App (1st) 241383, ¶ 18.

¶ 32    Raizel contends that she did not file her motion earlier in the proceedings because parenting-related issues are not subject to arbitration. According to Raizel, once the litigation shifted from parenting-related issues to financial issues, she could finally force Asher to honor

their arbitration agreement and she asserted the contract at this first viable opportunity. She relies on *In re Marriage of Best*, 387 Ill. App. 3d 948 (2009) and *In re Marriage of Haleas*, 2017 IL App 2d 160799, ¶ 26, which she mistakenly argues indicate that parenting-related issues cannot be arbitrated because the civil courts have exclusive "authority and discretion over all such matters, even if the parties agree to submit them for arbitration." In other words, Raizel contends that she and Asher "were required to remain in the Circuit Court until the child custody and visitation issues" were resolved.

¶ 33     Raizel is misstating the law. These cases indicate that the courts will not enforce contracts that are contrary to public policy and that public policy strongly limits the ability to contract away rights for child custody and support. This is illustrated by the pre-marital contract at issue in *Best*, 387 Ill. App. 3d 948, which provided that if the parties dissolved their marriage, then each of them would bear their own attorney fees. The court determined that the fee clause was not enforceable when it came to child support issues, because it discouraged the parents from pursuing litigation in their child's best interests. *Id*. at 951. The other case, *Haleas*, 2017 IL App 2d 160799, ¶ 26, was about maintenance and the court remarked, "This case does not involve child custody or support issues, where the law severely limits, on public policy grounds, the ability to privately contract away or limit [child custody or support] rights." Neither of these holdings suggest that that parenting-related issues cannot be arbitrated. There is no statute, regulation, or precedent which restricted the parties to the circuit court in any way.

¶ 34     Raizel argues that her actions have been consistent with the arbitration agreement, because she did not submit any arbitrable issues to the circuit court and was simply responsive to Asher's pleading and conforming to the circuit court's orders about discovery. She relies on *Clanton v.*

*Oakbrook Healthcare Centre, Ltd.*, 2022 IL App (1st) 210984, ¶ 48, in which the defendants answered the complaint and responded to discovery, but did not ask the court to rule on a substantive issue. We find that case distinguishable in part because the *Clanton* defendants initially were unaware there was a contract that included an arbitration clause, and upon discovering it in their files, they promptly asserted their right to arbitrate. *Clanton*, 2022 IL App (1st) 210984, ¶ 51. Raizel, in contrast, was always aware of her "AGREEMENT TO MEDIATION/ARBITRATION" with the CRC and did not promptly assert it. She was in mediation and arbitration with Asher before it became apparent to him that she would not cooperate and comply with the CRC's directions and he then resorted to requesting emergency relief from the circuit court. Raizel could have challenged Asher's emergency petition for an order of protection on the basis of the parties' arbitration agreement, but she chose to participate in the litigation.

> "Participation in litigation is considered in the waiver determination in order to ensure that the proper forum for a dispute is established as early as possible. This policy prevents parties from waiting to see how they fare in a judicial forum before choosing arbitration, prevents the duplicative adjudication of disputes, and prevents the undue prejudice that results from a party spending time and money on litigation that will not ultimately resolve a case. The key determination when considering this factor, therefore, is whether a party has manifested an intent to proceed with litigation." *Kawasaki Heavy Industries, Ltd. v. Bombardier Recreational Products, Inc.*, 660 F.3d 988, 994-95 (7th Cir. 2011).

¶ 35    After the emergency petition was heard, there were many other opportunities during the ensuing months for Raizel to assert the arbitration agreement. Instead, she persisted in litigation. She chose to be in civil court rather than in the CRC. She asserted the arbitration clause only after

the parenting issues had been tried, after the circuit court severely limited her parenting time and denied her any decision-making authority, and after she had new counsel. She seems to have become interested in arbitration only because she was not faring well in a judicial forum. Thus, her actions contrast with the movants' prompt action in the *Clanton* opinion that she relies upon. *Clanton*, 2022 IL App (1st) 210984, ¶ 51.

¶ 36    Furthermore, not all courts have ruled as the court did in *Clanton* when it found that there was no waiver when the defendants filed an answer and participated in limited discovery but did not submit arbitrable issues to the court. *Clanton*, 2022 IL App (1st) 210984. In *Woods v. Patterson Law Firm, P.C.,* 381 Ill. App. 3d 989, 996 (2008), for instance, the court concluded that waiver occurred as soon as the defendants "actively participated in discovery" by issuing their own interrogatories and seeking to take depositions, as these were tools of discovery that were not readily available in arbitration proceedings. Raizel did not file a pleading, but she was as responsive to discovery as the defendants were in *Clanton*, 2022 IL App (1st) 210984, and she took the additional step of voluntarily issuing her own interrogatories and requests for document production like the defendants did in *Woods*, 381 Ill. App. 3d at 996. Her participation in discovery was inconsistent with her contractual right to arbitrate to the extent that she was indicating that she was abandoning that right.

¶ 37    In addition, Raizel did more than the *Clanton* and *Woods* defendants when she took part in the hearing about Asher's reimbursement request for their child's return plane tickets from Israel. Asher's financial request was discussed, scheduled and rescheduled numerous times without any mention of the CRC. She also petitioned for an order of protection and included a request for child support and maintenance. The petition was denied, but had it been granted, it would have created

a financial imposition on Asher that would have been enforceable with the full weight of the court's inherent contempt powers. See *In re Marriage of Betts*, 190 Ill. App. 3d 961 (1989) (regarding order finding former husband in contempt due to failure to pay child support). Even more significant steps that she took in the judicial forum include agreeing to trial dates and discovery deadlines (some of which concerned financial issues); participating in the first three days of trial; and scheduling the last half-day of trial before she filed her motion to compel arbitration. She permitted the parenting issues to be heard in their entirety and decided. She permitted the litigation to advance into its final moments when the circuit court would hear evidence about the parties' financial circumstances and conclude the dissolution proceedings altogether. Without question, Raizel submitted substantive and arbitrable issues to the circuit court and her participation in the judicial forum has been inconsistent with her right to arbitrate the minimal financial issues that remain between the parties.

¶ 38    Another consideration in this appeal is "any delay in [Raizel's] assertion of [her] right to arbitrate, and any prejudice the delay caused to [Asher]." *Kostakos*, 142 Ill. App. 3d at 537. Asher returned to civil court on May 31, 2024, primarily because Raizel was not complying with her agreed-upon allocation of parenting time and was disparaging Asher to the children. Raizel did not file her "emergency" motion to compel arbitration until September 10, 2025. Thus, the parties were in active civil litigation for 15 months before Raizel filed the motion at issue on appeal. During this time, there were numerous courtroom appearances, filings, and hearings when she could have proclaimed her right to alternative dispute resolution, but she delayed asserting the parties' agreement. Furthermore, her delay has prejudiced not only Asher's time and effort but also caused him to incur tens of thousands of dollars in attorney fees and costs as he and counsel

prepared for and attended the various court dates, including the July 2025 trial.

¶ 39    Raizel does not address the final consideration in our analysis: whether the parties incorporated a no waiver provision in their arbitration agreement. See *Kostakos*, 142 Ill. App. 3d at 537. The parties' failure to include a clause stating that civil proceedings would not be deemed a waiver of the right to arbitrate indicates that the parties did not prefer arbitration. See *Id.* at 537-38 (the parties signaled their preference for arbitration when they included an American Arbitration Association rule in their contract stating that judicial proceedings would not be deemed a waiver of the right to arbitrate); *State Farm Mutual Automobile Insurance Co. v. George Hyman Construction Co.*, 306 Ill. App. 3d 874, 884 (1999) (indicating that Illinois courts have applied the American Arbitration Association rule literally when rejecting waiver arguments).

¶ 40    Based on the above, we hold that the denial of Raizel's motion to compel arbitration was not an abuse of discretion. We affirm the judgment of the circuit court.

¶ 41    Affirmed.